UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**Jason Thomas Harris**

        Petitioner,           Civil Action No.

v.                         Honorable

**Warden Bryan Morrison**

        Respondent.

## **Petition for Writ of Habeas Corpus**

Petitioner **Jason Thomas Harris**, through his attorneys, the **State Appellate Defender Office**, by **Emma Lawton**, Assistant Defender, respectfully states:

1.     Jason Harris is a citizen of the United States, is domiciled in Michigan, and is currently imprisoned in Jackson County, Michigan.

2.     Mr. Harris is unconstitutionally detained and imprisoned by the Respondent, Bryan Morrison, Warden, at the G. Robert Cotton Correctional Facility in Jackson, Michigan, where Mr. Harris is serving concurrent sentences of life imprisonment without parole, imposed by Judge David J. Newblatt of the Genesee County Circuit Court, after a jury found Mr. Harris guilty of first-degree murder, delivery of a controlled substance causing death, and solicitation of murder.

3.      Mr. Harris has exhausted all state remedies available to him with regard to the constitutional issues raised in this petition by taking the following steps:

a.      Mr. Harris raised the Sixth Amendment claims raised in this petition, concerning his (1) his trial attorney's failure to investigate and present the testimony of an independent toxicologist, and (2) his trial attorney's failure to object to the testimony of the medical examiner, in a timely motion for new trial before the circuit court on December 5, 2022.

b.      The circuit court denied Mr. Harris's motion for new trial on February 3, 2023.

c.      Mr. Harris appealed the circuit court's denial of these same claims in a timely filed brief on direct appeal to the Michigan Court of Appeals filed August 3, 2023.

d.      The Court of Appeals affirmed Mr. Harris's convictions and denied both claims on their merits in an unpublished opinion issued February 22, 2024.

e.    Mr. Harris filed a timely application for leave to appeal to the Michigan Supreme Court on April 18, 2024.

f.    The Michigan Supreme Court denied leave to appeal in an unreasoned order issued September 30, 2024.

4.    As set forth in the accompanying Memorandum of Law, Mr. Harris is being detained unconstitutionally because he was deprived of his constitutional right to the effective assistance of counsel, who failed to investigate and present the testimony of an independent toxicologist and failed to object to testimony by the medical examiner that vouched for the credibility of other witnesses and invaded the province of the jury.

5.    Mr. Harris has not filed any previous Petition for Writ of Habeas Corpus in this or any other federal district court.

6.    This petition is timely brought and within the statute of limitations for habeas corpus actions under 28 U.S.C. § 2254(d)(1)(A). On September 30, 2024, the Michigan Supreme Court denied Jason's application for leave to appeal. *People v. Harris*, 11 N.W.3d 479 (Mich. 2024). The time for filing a petition for certiorari to the U.S. Supreme Court expired on December 30, 2024.

**Therefore,** Petitioner Jason Harris requests:

A. That Respondent be required to appear and answer the allegations of this petition;

B. That after full consideration, this Court grant this Petition for Writ of Habeas Corpus and relieve Mr. Harris of the unconstitutional restraint on his liberty by ordering the State to either release him from custody or retry him within a reasonable period of time;

C. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances; and

D. That this Court grant oral argument in this matter.

Respectfully submitted,

**State Appellate Defender Office**
By:   /s/ Emma C. Lawton
       Emma C. Lawton (P80816)
       3031 West Grand Blvd, Suite 450
       Detroit, Michigan 48202
       (313) 256-9833
       elawton@sado.org

Date: December 26, 2025

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**Jason Thomas Harris**

       Petitioner,

v.

**Warden Bryan Morrison**

       Respondent.

Civil Action No.

Honorable

## <u>MEMORANDOM OF LAW IN SUPPORT OF</u>

## <u>PETITION FOR WRIT OF HABEAS CORPUS</u>

STATE APPELLATE DEFENDER OFFICE

By:    Emma C. Lawton (P80816)
       Assistant Defender
       *Counsel for Jason Thomas Harris*
       3031 West Grand Boulevard, Suite 450
       Detroit, Michigan 48202
       Phone: (313) 256-9833
       elawton@sado.org

# Table of Contents

Table of Contents ........................................................... 2

Index of Authorities.......................................................... 5

Procedural History ......................................................... 8

Overview of Material Facts......................................................... 9

    A. Responding officers see no evidence of murder......................... 11

    B. The medical examiner, Dr. Hunter, rules Christina's death
       an accidental overdose............................................. 12

    C. Five years later, Dr. Hunter changes his mind and rules
       Christina's death a homicide........................................ 14

    D. Jason is charged and tried for murder................................ 15

       1. Jason's coworkers describe a workplace where people
          gossip and complain about their spouses. ....................... 16

       2. Jason's siblings disagree about the state of their
          brother's marriage............................................. 19

       3. The Harrises had a complex relationship....................... 21

       4. Jason spirals downward after Christina's death................ 24

       5. Conflicting accounts of Christina's relationship with
          drugs........................................................... 26

       6. Testing finds no heroin in limited samples of Christina's
          frozen breast milk and no opioids in her stomach. ............. 27

       7. Jason answers questions about Christina's death. ............. 28

       8. Prosecution experts opine Christina was poisoned with
          heroin......................................................... 29

    E. Conviction and Sentencing............................................. 31

    F. Appellate Proceedings ............................................... 32

Standard of Review ......................................................... 34

Argument........................................................................ 36

I.  In finding defense counsel's failure to consult a toxicologist deficient but not prejudicial, the state courts unreasonably applied *Strickland v. Washington* by failing to consider the effect of missing expert testimony on other trial evidence and by imposing a heightened prejudice standard. ............................ 36

    A. The *Strickland* Standard. ............................................. 38

    B. The state court agreed testimony by an independent toxicologist could affect the jury's verdict. ................. 42

        1. The state court unreasonably applied *Strickland* when it failed to take "due account of the effect" of counsel's failure to investigate on the prosecution's remaining evidence. ................................................................ 47

        2. The state court unreasonably applied *Strickland*'s definition of a "reasonable probability" when it concluded evidence could affect the jury's verdict but not undermine confidence in the outcome. ................ 58

    C. Jason is entitled to relief under de novo review. ...................... 61

II.  The state court erred under (d)(1) and (d)(2) in rejecting Jason's claim that his attorney was ineffective for failing to object to Dr. Hunter's trial testimony vouching for the credibility of the prosecution's witnesses, the prosecution's case, and invading the province of the jury. ................................ 65

    A. Dr. Hunter's testimony was inadmissible under clearly established law interpreting MRE 702. ..................................... 68

        1. Dr. Hunter told jurors the testimony of the prosecution's lay witnesses was credible. ................................... 70

        2. Dr. Hunter told jurors the police investigation was reliable because it was so thorough. ..................................... 73

        3. Dr. Hunter told jurors Jason was responsible for Christina's death because Jason, or a hitman Jason hired, killed her. ................................... 74

    B. The state court erred under (d)(2) when it held that Dr. Hunter did not tell jurors Jason was guilty or had a culpable mind. ................................... 77

1. No fair reading of Dr. Hunter's testimony and 2019 autopsy report supports the conclusion that Dr. Hunter *did not* tell the jury that Jason was responsible for Christina's death and that he acted with intent. .................. 78

2. The state court's unreasonable read of Dr. Hunter's evidence caused it to erroneously conclude any objection was frivolous and, thus, counsel was not ineffective ........... 80

C. The state court erred under (d)(1) when it concluded counsel's failure to object was not deficient because, to the extent Dr. Hunter vouched for credibility, he was just describing the basis for his opinion. ......................................... 85

D. Jason is entitled to relief under de novo review. ...................... 88

Relief Requested ...................................................................... 92

# Index of Authorities

### <u>Cases</u>

*Brumfield v. Cain,*
 576 U.S. 305 (2015)......................................................................79
*Couch v. Booker,*
 632 F.3d 241 (6th Cir. 2011)........................................................89
*Daubert v. Merrell Dow Pharmaceuticals,*
 509 U.S. 709 (1993)..............................................................68, 84
*Dendel v. Washington,*
 647 Fed. Appx. 612 (6th Cir. 2016)..........................................59-61
*Gilbert v. DaimlerChrysler Corp,*
 470 Mich. 749; 685 N.W.2d 391 (2004)................................68, 69, 84
*Harrington v. Richter,*
 562 U.S. 86 (2011)................................................................ passim
*Hewitt-El v. Burgess,*
 53 F.4th 969 (2022).......................................................................38
*Hinton v. Alabama,*
 571 U.S. 263 (2014).......................................................................39
*Hodge v. Plappert,*
 136 F.4th 648 (6th Cir. 2025) ......................................................78
*Jimenez v. Quarterman,*
 555 U.S. 113 (2009)........................................................................8
*Johnson v Williams,*
 568 U.S. 289 (2013).......................................................................35
*Maples v. Stegall,*
 340 F.3d 433 (6th Cir. 2003)........................................................35
*McMann v. Richardson,*
 397 U.S. 759 (1970).......................................................................38
*Miller-El v. Cockrell,*
 537 U.S. 322 (2003).......................................................................78
*O'Sullivan v. Boerckel,*
 526 U.S. 838 (1999).......................................................................34
*Penley v. Davids,*
 No. 20-cv-132, 2023 WL 2259131 (W.D. Mich. Feb. 28, 2023).......85-87
*People v. Beckley,*
 434 Mich. 691; 456 N.W.2d 391 (1990)..........................................66

*People v. Dendel,*
    481 Mich. 114; 748 N.W.2d 859 (2008)................................................60

*People v. Drossart,*
    99 Mich. App. 66; 297 N.W.2d 863 (1980) ..........................................84

*People v. Fisher,*
    193 Mich. App. 284; 483 N.W.2d 452 (Mich. Ct. App. 1992) .............57

*People v. Harris,*
    11 N.W.3d 479 (Mich. 2024) ..................................................................8

*People v. Harris,*
    No. 359675, 2024 WL 740709 (Mich. Ct. App. Feb. 22, 2024) .... passim

*People v. Kowalski,*
    492 Mich. 106; 821 N.W.2d 14 (2012)................................ 68, 69, 84, 85

*People v. Leffew,*
    508 Mich. 625; 975 N.W.2d 896 (Mich. 2022) ....................................58

*People v. McFarlane,*
    325 Mich. App. 507; 926 N.W.2d 339 (2018) .......................... 81, 83, 84

*People v. Smith,*
    425 Mich. 98; 387 N.W.2d 814 (1986)........................................ passim

*People v. Thorpe,*
    405 Mich. 239; 934 N.W.2d 693 (2019).................................. 81, 82, 84

*People v Musser,*
    494 Mich. 337; 835 N.W.2d 319 (2013)................................. 69, 70, 82

*Poulsen v. United States,*
    717 Fed. App'x 509 (6th Cir. 2017)......................................................41

*Ramonez v. Berghuis,*
    490 F.3d 482 (6th Cir. 2007)............................................ 49, 50, 55, 58

*Randolph v. Macauley,*
    155 F.4th 859 (6th Cir. 2025) .................................................. 78, 80, 85

*Rice v. White,*
    660 F.3d 242 (6th Cir. 2011)........................................................61, 78

*Richey v. Bradshaw,*
    498 F.3d 344 (6th Cir. 2007)........................................................40, 59

*Rompilla v. Beard,*
    545 U.S. 374 (2005)....................................................................41, 47

*Schlup v. Delo,*
    513 U.S. 298 (1995)............................................................................92

*Stermer v. Warren,*
    959 F.3d 704 (6th Cir. 2020)..............................................................35

*Strickland v. Washington,*
    466 U.S. 668 (1984) .................................................................... passim
*Wiggins v. Smith,*
    539 U.S. 510 (2003) ................................................................... 47, 58

## **Constitutions, Statutes, and Rules**

U.S. Const. amend. VI ................................................................... 38
U.S. Const. amend. XIV .................................................................. 38
28 U.S.C. § 2243 ......................................................................... 92
28 U.S.C. § 2244(d)(1) ................................................................... 8
28 U.S.C. § 2254(a) ...................................................................... 34
28 U.S.C. § 2254(b)(1)(A) ............................................................ 8, 10
28 U.S.C. § 2254(d) .................................................................. 34, 35
28 U.S.C. § 2254(d)(1) ................................................................... 34
28 U.S.C. § 2254(d)(2) ................................................................... 77
28 U.S.C. § 2254(e)(1) ................................................................... 49
MCL 52.202 ............................................................................... 84
MCL 750.157(b)(2) ....................................................................... 54
MRE 702 .............................................................................. passim

# Procedural History

Following a jury trial in Genesee County, Jason Harris was convicted of first-degree murder, solicitation of murder, and delivery of a controlled substance causing death. TT8 at 4-5. He is currently in the custody of Warden Bryan Morrison at the G. Robert Cotton Correctional Facility, serving concurrent sentences of life without parole on all counts.

Jason timely appealed his conviction in the state courts. The Michigan Court of Appeals affirmed Jason's convictions. *People v. Harris*, No. 359675, 2024 WL 740709 (Mich. Ct. App. Feb. 22, 2024).

On September 30, 2024, the Michigan Supreme Court denied Jason's application for leave to appeal. *People v. Harris*, 11 N.W.3d 479 (Mich. 2024). The time for filing a petition for certiorari to the U.S. Supreme Court expired on December 30, 2024.

Jason now petitions this Court for a writ of habeas corpus. This petition is timely filed. *See* 28 U.S.C. § 2244(d)(1); *Jimenez v. Quarterman*, 555 U.S. 113, 119-120 (2009). This petition presents the Sixth Amendment claims Jason brought before the state courts. Jason has properly exhausted all avenues for relief in the state courts. 28 U.S.C. § 2254(b)(1)(A).

## Overview of Material Facts

In September 2014, Jason and Christina Harris had been married for eleven years. PX 45 at 39. They had two daughters—a four-year-old and a four-month-old—and both parents worked long hours to support their family. TT4 at 48; PX 45 at 15-16, 20. Jason worked for United Plastics, and could start work as early as 4:30am or between 7:00 and 8:00am. TT3 at 42-43.

Christina managed the Subway at Genesys Hospital. TT3 at 114-115; PX 45 at 11-12. Her hours were more variable than Jason's, starting around 10:00am and continuing late into the evening. PX 45 at 11-12, 34. Christina sometimes overslept or fell back asleep after Jason left for work, and she counted on him to wake her up. TT3 at 42; PX 45 at 45, 56. Jason would text or call Christina if he thought she was running behind and checked in with her throughout the day. *See, e.g.,* PX 45 at 46, 68.

One morning, on September 18, Jason texted a neighbor to see whether Christina had left for work because she wasn't answering his calls. TT2 at 52; PX 90 at 88. Jason also called the Subway where Christina worked to see if she was there. PX 90 at 88; PX 45 at 72. Since the neighbor saw Christina's van was in the driveway, Jason asked her

to knock on the front door of the house. TT2 at 52. Christina answered and said she had overslept. *Id.*

A few weeks later, on September 29, Jason arrived at work a little after 7:00am. TT3 at 42. At about 9:00am, Jason began texting Christina that it was "[t]ime to wake up and start getting ready for work." PX 45 at 80. Jason phoned Christina twice at 9:19am and 9:38am; then, when she didn't answer, he called the Subway where she worked at 9:41am.[1] TT6 at 107; PX 90 at 90. He continued texting her, "Did you go in early and busy or are you oversleeping?? Text or call me back so I know your at least ok.. [sic]." PX 45 at 80. Again, like on September 18, he asked the neighbor to check whether Christina's van was in the driveway and to knock on the front door if it was. TT2 at 55.

This time Christina did not answer when the neighbor knocked at the front door, which was unlocked. TT2 at 55. The neighbor entered the house and found Christina in bed. TT2 at 55. She tapped Christina's foot;

---

[1] At trial, the prosecution wasn't sure if Jason called the Subway at Genesys Hospital where Christina worked or Dortch Enterprises, the restaurant's franchisee. TT6 at 118. Jason called 810-603-0470 three minutes after calling Christina's phone twice. PX 90 at 90. That phone number is assigned to the Genesys Regional Medical Center Subway. Subway Restaurants, *Locations*, https://restaurants.subway.com/united-states/mi/grand-blanc/1426-genesys-parkway (accessed December 22, 2025). Henry Ford Health and Ascension, Genesys's parent, merged and rebranded in 2024.

when Christina didn't respond, the neighbor left and called Jason at 9:54am to say that Christina "seemed to be out cold." TT2 at 56; PX 90 at 90. Jason said he would come home. TT2 at 56.

Jason told his supervisor he needed to go home because the neighbor couldn't wake Christina, then he left right away. TT3 at 41, 43. Meanwhile, the neighbor tried to wake Christina again. TT2 at 57-58. She realized that Christina felt cold and called 911. TT2 at 59-60.

The paramedics arrived before Jason and determined that Christina had died. TT2 at 63, 152. They did not attempt to resuscitate her but weren't sure how long she had been deceased. TT2 at 153-155. Jason went straight inside when he arrived home. TT2 at 63. He spoke to a paramedic and let them know that Christina had been coughing when he left for work. TT2 at 157. Jason called Christina's mother at 10:20am, then his own mother at 10:28am. PX 90 at 90.

### A.   Responding officers see no evidence of murder.

Soon, the police arrived. TT2 at 117. Officer Gregory Pray interviewed Jason in the driveway. TT2 at 117. Jason explained that he had called the neighbor because he was worried Christina would be late for work and that he had just come back home. TT2 at 118. He said

Christina had slept restlessly the night before, she had been coughing a lot, and they hadn't talked in the morning. TT2 at 118-119.

Officer Pray did not believe he was at the scene of a murder; he thought Christina's death was "just a medical" event. TT2 at 122. He walked around the house to "just glance at things," but nothing "piqued [his] interest to look further." TT2 at 131. He explained there was no need to thoroughly search the house because, "There was nothing at the point where the body was that would lead me to start digging any deeper for anything." TT2 at 131. Even years later, he admitted at trial, he was surprised the case was later investigated as a homicide. TT3 at 132.

A medical examiner investigator arrived to take charge of Christina's body. TT2 at 123. He photographed the body and the surrounding area. TT2 at 127-129. He focused on the bedroom and did not photograph other areas of the house, such as the bathroom, kitchen, or living room. TT2 at 130.

## B.   The medical examiner, Dr. Hunter, rules Christina's death an accidental overdose.

The next day the medical examiner for Genesee County, Dr. Brian Hunter, conducted an autopsy of Christina. TT6 at 9, 20; PX 72.

Dr. Hunter found vomit in Christina's mouth and a "foam cone" over her mouth and nose. TT6 at 21. At trial, Dr. Hunter explained that a foam cone was excessive lung fluid that backed out of the main airways and came out of the mouth. TT6 at 22. A foam cone could be a sign of an opiate overdose. TT6 at 24.

During the autopsy, Dr. Hunter did not find puncture or needle marks suggesting Christina injected drugs. TT6 at 24. He did not check Christina's nose for evidence that she had snorted drugs because, Dr. Hunter explained, damage like a "nasal septum perforation" was not reliable evidence that a person was (or was not) a chronic drug user. TT6 at 25-26. He did not examine her nose with a light or look inside her nose for evidence of drug residue. TT6 at 58-59.

Christina's stomach was empty except for "a thin pink fluid," and there was nothing in her small or large intestine to show that she had recently eaten. TT6 at 47-48, 63. Dr. Hunter sampled the fluid. TT6 at 47. He also collected blood and urine samples. TT6 at 23.

After the autopsy, Dr. Hunter sent those blood and urine samples for toxicological testing. TT6 at 26. The laboratory found morphine in Christina's blood and 6-Monoacetylmorphine ("6-MAM") in her urine.

TT6 at 27; PX 54. Dr. Hunter explained at trial that morphine and 6-MAM are metabolites of heroin. TT6 at 28. 6-MAM is short-lived, while morphine has a longer half-life. TT6 at 28-29. The laboratory also found codeine in Christina's blood, which Dr. Hunter testified could be the result of taking cough syrup or the result of taking a contaminated street drug. TT6 at 28-29.

Based on the toxicology results, Dr. Hunter ruled that Christina's death was an accident, that she ingested heroin, and that heroin toxicity caused her death. TT6 at 30-33; PX 72.

### C. Five years later, Dr. Hunter changes his mind and rules Christina's death a homicide.

Five years later, in March 2019, Dr. Hunter was deposed as part of a civil lawsuit brought by Christina's family against Jason. TT6 at 40. During that process, Dr. Hunter was presented with depositions, police reports, and Christina's past medical and employment records, among other things. TT6 at 40-42. Dr. Hunter then requested the police provide his office with their investigation records. TT6 at 41.

Law enforcement had been investigating Christina's death in the intervening years but were unwilling to charge anyone as long as Dr. Hunter ruled her death an accident. TT6 at 111. The police presented

the results of their investigation to Dr. Hunter, who now decided that he didn't believe Christina would have used heroin recreationally and was convinced by police that Jason wanted his wife dead. TT6 at 40-43.

Dr. Hunter changed his manner-of-death finding to homicide, not because of new scientific evidence, but based on witness statements and police reports. TT6 at 45-46. He issued an amended forensic autopsy report in 2019 and an amended death certificate ruling Christina's death a homicide. PX 73; PX 75.

### D.   Jason is charged and tried for murder.

In August 2019, Jason was arrested and charged with First-Degree Premeditated Murder, Solicitation of Murder, and Delivery of a Controlled Substance Causing Death. Those charges were bound over following a preliminary examination where Dr. Hunter testified about his changed opinion. PE Tr. Vol 3 at 16-20, 39-54.

Jason initially retained an attorney, Albert Zerka, to represent him. But in March 2021, Zerka orally moved to withdraw and requested Jason be assigned counsel. 3/10/2021 Pretrial Tr. at 5-6. Zerka explained that, financially, Jason had "no ability to continue to have me represent him in this case, nor does he have the financial ability to hire experts that

he's going to need to try this case." 3/10/2021 Pretrial Tr. at 5-6. He emphasized, "There is definitely going to need to be experts, you know, appointed in this case to refute some of the evidence from the prosecutor . . . ." 3/10/2021 Pretrial Tr. at 5.

The circuit court allowed Zerka to withdraw and appointed David Clark to represent Jason. 3/10/2021 Pretrial Tr. at 8; 3/12/2021 Order Appointing Counsel. Clark consulted no experts, and Jason proceeded to trial in November 2021. Harris Offer of Proof; Clark Affidavit.

At trial, the parties' primary dispute centered on whether Christina used heroin recreationally and died of an accidental overdose, or whether she was surreptitiously poisoned with heroin in her cereal. TT2 at 33-35; TT7 at 49-50, 80-83.

### 1. Jason's coworkers describe a workplace where people gossip and complain about their spouses.

The prosecution first sought to demonstrate that Jason could access drugs through his coworkers and that he had solicited a coworker to kill Christina. But the witnesses they called did not have clear memories of these interactions and characterized Jason's comments as jokes.

David Groshong testified that Jason asked him for Xanax, and that he sold Jason ten 0.5mg Klonopin pills. TT3 at 8-9, 23. Groshong said he

didn't "personally know" what Jason did with the pills, but vaguely remembered Jason commenting that he put the Klonopin in a drink and that his wife could taste it. TT3 at 11-14. Groshong struggled to recall what Jason said, even after refreshing his recollection, and told the jury he thought "it was a joking matter, you know, like it was a joke." TT3 at 13. He clarified, "everybody complains about their wives as nagging and this and that, you know, I – it wasn't a very funny joke, but it was just a little extreme." TT3 at 26. Groshong also struggled to remember a conversation he had with the police in 2017, where he claimed that Jason told him he planned to crush up Xanax and put it in Christina's cereal so that she would "stop nagging." TT3 at 17.

Alan Sharp, another coworker, testified that he never spoke to Jason about Christina and that Jason never told him he wished something would happen to Christina. TT3 at 78-79, 86-87. After refreshing his recollection, Sharp admitted that he "might have" told the police that Jason wished his wife was dead, but he couldn't remember the now seven-year-old conversation. TT3 at 79-80. He denied that Jason ever asked him for drugs or tried to buy drugs from him. TT3 at 83. Sharp

said that sometimes he hung out with Jason and Christina, and they argued a lot but also were loving towards each other. TT3 at 81-82.

John Jamison, a foreman, thought Jason and Christina got along well and never saw them argue or fight. TT3 at 95. When asked if Jamison ever heard Jason say he wanted Christina dead, he replied "Well, I've heard that before, but I never heard him say nothing to me about that." TT3 at 96. After reviewing a police report, he agreed he told police he heard Jason say that. TT3 at 97-98. Jamison couldn't actually remember talking to police. TT3 at 106-107.

Zachariah Shustock told the jury he was a friend and coworker of Jason's. TT4 at 6. He said Jason once asked him where to get pills and said that he put a pill in one of Christina's drinks. TT4 at 8. Shustock also recalled that Jason told him he hired someone to kill his wife, "or not to kill her, but to try or look at his house and the person got caught." TT4 at 9. He clarified that Jason told him the hired person "got seen by a neighbor and arrested," and that the person was a felon carrying a pistol. TT4 at 13.

The Michigan State Police investigated but found zero evidence corroborating Shustock's tale that Jason hired a hitman. TT6 at 105.

They reviewed "records through probation, parole, District Court records, Davison City Police, Michigan State Police, any police agency that could have arrested someone" but found no one who "may have been arrested and maybe caught with a gun" near the Harrises' home. TT6 at 105.

Shustock also testified that Jason asked if he would kill Christina in exchange for money, and that he answered "like, yeah, no." TT4 at 10. He explained, "I thought he was just joking" and was not surprised by the conversation because "I just thought he was kind of venting, you know, because I could understand if he is working all the time and his wife is not, that could be, you know, irritating." TT4 at 10. He didn't recall Jason ever saying that he wished his wife was dead, but that he did want to find a drug that would "put her to sleep." TT4 at 14. Shustock reiterated that he also complained about his girlfriend during these conversations and that he thought Jason was joking. TT4 at 15-18.

### 2.   Jason's siblings disagree about the state of their brother's marriage.

After Christina died, Jason's brother Jeffrey contacted the police and brought their sister, Rachel, with him. TT4 at 156. Rachel did not remember speaking to the police. TT4 at 175. She testified she went to the police because Jeffrey "told her to" and she "just answered whatever

they asked." TT4 at 176. She explained that, at the time, she was using methamphetamine, crack, marijuana, and Xanax. TT4 at 179-180, 187.

Over the defense's objection, Jeffrey testified that he felt confident Jason had murdered Christina based on information Rachel told him. TT4 at 157. Jeffrey thought Jason didn't want a divorce, because of his experience with his first wife, but that he was not happy with Christina. TT4 at 152, 158. Jeffrey admitted Jason never told him that he wanted to kill Christina. TT4 at 167.

Rachel confessed that she may have described conversations that never happened, explaining that she "lived in an entirely altered state of reality. I was refused treatment because I was in psychosis." TT4 at 189, 192. She did not remember telling Jeffrey that she was concerned Jason had something to do with his wife's death and denied ever having such a concern or believing that Christina's death was suspicious. TT4 at 176. She never heard Jason say he wanted to get rid of Christina and she did not remember telling police that Jason made comments about hiring a hitman. TT4 at 174, 184.

### 3.  The Harrises had a complex relationship.

The prosecution tried to make Jason out to be a callous cheater. But Christina and Jason were a nuanced family struggling every day to make ends meet. At most, the prosecution presented evidence of banal emotional infidelity where, while married, Jason texted Lauren Keavey, a woman who lived out of state and who he never met in person, TT5 at 8, 17, and Leah Miller, a woman who dated his friend, TT4 at 65-66.

Meanwhile, Christina and Jason were a couple leaning on each other to make it through the chaos of a toddler and a baby. Jason went grocery shopping, did laundry, and mowed the lawn on his weekend off. *See, e.g.,* PX 45 at 6, 21, 26, 28.  Both parents were frustrated at work and trying to find new jobs that paid better, second jobs that paid more, or extra shifts and bonuses. *See, e.g.,* PX 45 at 3, 15, 22, 29, 31, 44, 55. Jason had asked for a raise to make $42,500; Christina's salary was $35,000 after an extended unpaid maternity leave. PX 45 at 24, 32. In between daily worrying about over-drafted bank accounts, making rent when a check didn't arrive, water shutoff notices, and a constant search for gas money, they sent their daughter to camp, talked about buying her

a bike on layaway, and Jason signed up to be her soccer coach. PX at 8, 10, 11, 16, 33, 34, 38, 43, 45, 47.

The prosecutor padded its case with rumor and speculation. Jason's sister, Rachel, recalled gossip after Christina's death about Jason seeing another woman. TT4 at 174. Rachel's then-girlfriend, Gwendolyn Jones, claimed she had a conversation with Jason a few months before Christina's death where Jason complained about his relationship. TT4 at 23. Allegedly, Jason said he didn't want a divorce because he would lose custody of his children and have to pay child support. TT4 at 24-26. But Rachel did not remember that conversation, even after the prosecutor attempted to refresh her memory. TT4 at 174.

Hearsay, left unobjected to, bolstered the prosecution's rumor mill. Neighbor Sheila Koop said that, sometime in August 2014, she saw Christina crying outside. TT2 at 50. Koop relayed Christina's out of court statement: Jason was cheating on her and she didn't know what to do. TT2 at 50-51. Koop reassured Christina that she had a beautiful family and hoped everything would work out. TT2 at 51. Christina never mentioned an affair to Koop again. TT2 at 76.

Hilary Jauss, Christina's former coworker, offered more hearsay. She claimed she spoke to Christina at a work picnic around August 14. TT4 at 201-203, 206. Christina allegedly told Jauss that Jason was cheating on her and that she had told Jason to stop texting the woman. TT4 at 205. Jauss stated that Christina then told her, "hey, if I ever come up dead, know that it was my husband." TT4 at 206. Jauss was not sure how to react to that comment. TT4 at 206.

But Christina's contemporaneous texts to Jason show no evidence she was afraid of her husband. On August 14, the same time as the work picnic, Christina and Jason argued about what time she would come home, and Christina tersely reminded Jason that she was working hard and didn't have time to "text random bitches from Massachusetts all fucking day." PX 45 at 36.

The couple wanted to make their relationship work. Two days after the work picnic, on August 16, Jason started the morning wishing Christina a "Happy Anniversary honey muah" and later in the day, "Sure doesn't feel like its been 13 years already, love you babe." PX 45 at 38. Christina teased her husband: "Cause it hasn't it's been 16 together and 11 married!" *Id*. Jason replied, "it doesn't seem like its been more that

[sic] 5-6," and they reminisced about their first time living together. PX 45 at 39. Then they planned a night out at the movies while the kids visited their grandparents. PX 45 at 39-40.

### 4. Jason spirals downward after Christina's death.

After Christina's death, Jason's life changed. Jason's children from his first marriage moved into his home. TT2 at 68. Leah Miller also moved in, and Sheila Koop testified that she looked through Jason's window and saw him give Leah "a little peck, you know, like a little kiss." TT2 at 69, 86. Jason's older children invited friends to the house and held parties. TT2 at 89. Gwendolyn Jones, Rachel's ex-girlfriend, saw Jason use cocaine and methamphetamine, and also used drugs herself. TT4 at 30-31. While fixing Jason's computer, Christina's stepfather found a picture of what appeared to be Jason using drugs after Christina's death. TT4 at 132.

When Christina was alive, Jason had been a good worker, earned promotions, and passed random drug screens. TT3 at 46, 75. But after Christina died, Jason's performance dropped off and he tested positive for amphetamines in November and December 2014. TT3 at 71, 73, 75. In December, Jason was fired from United Plastics. TT3 at 71.

Christina had been enrolled in life-insurance policies at Subway and United Plastics. Jason's phone records showed that on the day she died, thirty minutes after calling Christina's mother and his own mother, he called the Genesys Subway that Christina managed. PX 90 at 91. Shortly after calling Genesys, at 11:10am, Jason's phone records show a call to a number which appears to be a subsidiary of the Dortch Enterprises main number. PX 90 at 90; TT3 at 137.

Mareia Berry, the head of HR for Dortch Enterprises (Subway), testified that, on September 29, she received a phone call from Jason telling her Christina had passed. TT3 at 117. Berry said she spoke to Jason about Christina's employee life-insurance policy. TT3 at 118. Subway provided a basic $10,000 policy to all employees, and Christina had purchased an additional $100,000. TT3 at 118, 122. Berry explained that policies were purchased during open enrollment, which took place in October, so Christina must have enrolled in the additional policy no sooner than the year before, in October 2013. TT3 at 122. Jason also received $20,000 in life insurance from United Plastics. TT3 at 69-70.

Although the prosecution cast Jason's call to Berry as evidence that he was more interested in a payout than grieving his wife, finances were

a pressing matter. On September 23, less than week before Christina died, the Harrises had only $14 to use from the bank. PX 45 at 76. Now, after Christina's death, half of the family's income was gone.

### 5. Conflicting accounts of Christina's relationship with drugs.

Conflicting evidence was introduced at trial about whether Christina used drugs recreationally.

Rachel Harris testified that she had seen Christina "smoking weed and taking Vicodin." TT4 at 188. Asked to estimate when she saw Christina use drugs, Rachel said "it was continuous." TT4 at 188. Gwendolyn Jones had seen Christina smoke marijuana, but didn't "feel like Christy ever did drugs, besides like maybe weed or something." TT4 at 28. A few weeks before Christina's death, after she had a stressful day at work, Jason suggested she "take a 420 break." PX 45 at 62.

Christina's mother disagreed. She had never known Christina to use drugs or marijuana. TT5 at 64. She stated that Christina had been taking medication for post-partum depression, but in general her daughter did not like to take medication and was cautious about ingesting something that could impact the baby while she was

breastfeeding. TT4 at 49-52. However, Christina frequently smoked cigarettes. PX 45 at 10, 41, 59.

### 6. Testing finds no heroin in limited samples of Christina's frozen breast milk and no opioids in her stomach.

Before her death, Christina had been pumping and freezing breast milk. TT4 at 51, 91. The baby was fed frozen milk, not milk that had just been pumped. TT4 at 92. Christina's stepfather testified that Christina stored some frozen milk at the Harris home, but the majority was kept at her grandmother's home in a standing freezer. TT4 at 122. Her parents used the frozen breast milk to continue feeding the baby after Christina's death. TT4 at 136. A year or more later, her stepfather transferred the remaining breast milk—about 50 bags—to the Davison Police. TT4 at 128-129; TT6 at 113.

The Michigan State Police tested three samples of breast milk dated July 21, 2014; August 21, 2014; and September 12, 2014. TT5 at 30, 36. They found no controlled substances in those samples. TT5 at 31, 58. Police tested only three samples because it was expensive and they "didn't feel that it was of any value to test every single bag." TT6 at 113.

In 2017 the police tested for the first time the gastric fluid Dr. Hunter collected during the 2014 autopsy. TT5 at 54. The lab was asked to run "a designer opioid test" and found nothing. TT5 at 54-55. The lab was not asked to test for heroin and did not do so. TT5 at 55.

### 7.    Jason answers questions about Christina's death.

The prosecution played, over the defense's objection,[2] a recorded conversation between Christina's mother and Jason, made a year after Christina's death. TT4 at 87. Asked to describe Christina's last day, Jason said she ate cereal while falling asleep in her chair. Jason told Christina to go to sleep. In the morning, Jason said, he didn't hear Christina move until she started coughing as he was getting ready to leave. He told their daughter to let mom sleep. Jason dropped off the kids, went to work, and texted Christina. When she didn't answer, he kept texting, called her, and called her workplace. Then Jason called the neighbor. Jason thought Christina's cough sounded like a normal cough and he wasn't aware Christina had used drugs. He observed she had done things in the past, but nothing that serious. PX 31.

---

[2] Trial counsel objected to foundation stating, perhaps it was "malpractice," but he had not listened to the recording before trial and was not aware the prosecution had provided it to him in discovery because he was the "third or fourth lawyer on this thing" (Clark was the second lawyer to represent Jason). TT4 at 73-74.

The prosecution also had an officer describe an interview with Jason in September 2019, following his arrest, in which Jason provided a similar description of Christina's death as the account recorded on the phone. TT6 at 125. He also admitted purchasing 8 Vicodin pills for Christina and wondered whether they could have been heroin. TT6 at 126-127. He denied administering pills to Christina and said he did not see her take the pills. TT6 at 126, 129. Jason said he thought he was buying Vicodin and never tried to buy heroin in any form. TT6 at 128.

### 8. Prosecution experts opine Christina was poisoned with heroin.

After presenting these lay witnesses, the prosecution called Dr. Hunter to opine about Christina's cause and manner of death. TT6 at 10. Dr. Hunter was qualified by the court as an expert in "the area of forensic pathology." TT6 at 14-15. He described the autopsy process and concluded that Christina died of heroin toxicity based on the presence of morphine in her blood and 6-MAM in her urine. TT6 at 26-29.

Dr. Hunter turned to the manner of Christina's death. He explained that in 2014 he ruled Christina's death an accident because he felt that was the most appropriate ruling for "people who chronically use heroin or experiment with it" and he had experienced that ruling an overdose

— 29 —

"undetermined" resulted in "a lot of phone calls and a lot of unhappy – it doesn't tell anyone anything." TT6 at 33.

Then, in 2019, Dr. Hunter changed the ruling to homicide after he reviewed the results of the civil suit and the police investigation. TT6 at 40. He summarized the contents of the depositions, witness statements, and other police reports that he reviewed—the same witnesses and information the prosecution had presented over the last four days of trial—and told the jury that he found that evidence credible. TT6 at 40-46. Dr. Hunter opined that there was strong evidence "of someone else being involved in her death" and clearly indicated that he believed Jason was that person. TT6 at 45-46. He concluded, "I felt very, very, very comfortable that [the state] actually proved the negative, [Christina] did not use drugs knowingly of her own accord, okay?" TT6 at 43.

The prosecution's final witness was Dr. Bryan Judge, a medical toxicologist. TT7 at 18. Dr. Judge explained that, after using heroin, a person would be very sleepy and could become nauseous and vomit. TT7 at 23. A person experiencing a heroin overdose would breathe so slowly that they would stop breathing altogether and die. TT7 at 23. Dr. Judge testified that small amounts of morphine could appear in breast milk

— 30 —

after heroin use and that it should remain stable when frozen. TT7 at 19-20. He also opined that, while heroin is bitter, it could be diluted in cereal milk and then "it'd be unlikely to detect it." TT7 at 24.

Dr. Judge told the jury he believed Christina's death was consistent with eating heroin. TT7 at 30. Dr. Judge opined it was "extremely unusual" that there were no drugs or paraphernalia at the scene. TT7 at 29. He said "track marks, needles, rolled up dollar bills, powder residue, things of that nature" are "invariably at the scene of an opioid overdose associated with heroin or fentanyl." TT7 at 29. Dr. Judge concluded that Christina could not have injected heroin, because the autopsy found no marks, and she had not snorted heroin because "[t]here usually is powder residue left at the scene." TT7 at 30. Although he admitted that vomit and foam could have obscured powder in Christina's nose, he was adamant that the absence of "residue or rolled up paper or dollar bills at the scene" showed she had not snorted heroin. TT7 at 30, 41.

### E.   Conviction and Sentencing.

The jury convicted Jason on all counts. TT8 at 4-5. The court sentenced him to concurrent sentences of life without parole. ST at 27.

### F.   Appellate Proceedings

On appeal, Jason finally got his chance to consult an independent expert. Toxicologist Dr. William Sawyer reviewed Jason's case and concluded the science did not support Dr. Judge and Dr. Hunter's conclusion that Christina ate heroin. Sawyer Affidavit I.

Jason presented Dr. Sawyer's affidavit to the trial court and moved for a new trial based on his attorney's ineffective failure to investigate. He also challenged counsel's failure to object to Dr. Hunter's testimony as ineffective. The prosecutor, arguing there were no factual disputes requiring an evidentiary hearing, produced an affidavit by Dr. Judge disagreeing with Dr. Sawyer's opinion. Judge Affidavit. The circuit court erroneously applied *Harrington*'s definition of AEDPA's "double deference" standard to a frontline state-court appeal, refused to give Jason an evidentiary hearing, and denied the motion. 1/23/2023 Tr. at 10-11, 16-17, 46.

Jason moved the Michigan Court of Appeals to remand for an evidentiary hearing, which a divided panel denied. *People v. Harris*, unpublished order of the Court of Appeals, issued June 8, 2023 (Docket No. 359675). Jason filed his brief on appeal and, since he had twice been

denied remand, supplemented the record with a second affidavit from Dr. Sawyer responding to Dr. Judge. Sawyer Affidavit II.

Jason asked the Court of Appeals a second time to remand. Continuing its contradictory strategy of submitting new evidence in support of its claims that there were no factual disputes, the prosecution opposed remand and submitted an affidavit by Jason's trial attorney who asserted he made only reasonable strategic decisions. Clark Affidavit.

The Michigan Court of Appeals denied remand again, this time *sua sponte* expanding the record to add trial counsel's affidavit. *Harris*, 2024 WL 740709 at *4. Then the court made its own credibility calls: it didn't believe counsel's excuses for not investigating or consulting a toxicologist, but accepted his reasons for not objecting to Dr. Hunter's testimony. *Id.* at *6, *11. The court denied Jason's Sixth Amendment claims and affirmed his convictions.

Jason applied to the Michigan Supreme Court for leave to appeal and was denied. He now petitions this Court for relief.

## Standard of Review

AEDPA governs Jason's petition for habeas corpus relief from a state court conviction. *See* 28 U.S.C. § 2254(d). AEDPA permits the writ to issue if Jason "is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a).

As a precondition to any habeas corpus relief, Jason must first have presented his claims to the state courts in accordance with state court procedures. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If the state courts rejected Jason's claims "on the merits," then AEDPA directs federal courts to defer to the state court's decision unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). For the purposes of § 2254(d)(1), when reviewing the reasonableness of a state court's decision, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (cleaned up).

Jason's petition presents claims of ineffective assistance of counsel. Because the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" this Court's review of the state courts' decision under AEDPA is "doubly" deferential. *Harrington*, 562 U.S. at 105. "The question is whether there is any reasonable argument that counsel satisfied *Strickland'*s deferential standard." *Id.*

If Jason establishes the state courts' decision was an unreasonable application of SCOTUS precedent, this Court owes no deference to the state courts and reviews the federal claim de novo. *Johnson v Williams*, 568 U.S. 289, 303 (2013); *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

# Argument

## I. In finding defense counsel's failure to consult a toxicologist deficient but not prejudicial, the state courts unreasonably applied *Strickland v. Washington* by failing to consider the effect of missing expert testimony on other trial evidence and by imposing a heightened prejudice standard.

Seven years after his wife died of a heroin overdose, Jason was tried and convicted of first-degree premeditated murder, delivery of a controlled substance causing death, and solicitation of murder. The prosecution's theory hinged on convincing the jury that Jason poisoned Christina by giving her a bowl of cereal laced with a fatal dose of heroin. Oral ingestion, the prosecution argued, was "the only thing that makes sense." TT7 at 72. The prosecution told jurors that oral ingestion proved Christina was murdered because a recreational user would have snorted or injected the drug. TT7 at 50-51.

The prosecution was wrong: Christina had not eaten heroin. Laboratory results revealed high levels of a metabolite in her urine that would not be present after a person ate heroin.

But jurors never heard the prosecution was wrong. Defense counsel didn't investigate the claims of the prosecution's toxicologist and didn't consult an independent expert. As a result, jurors never learned the science they needed to properly evaluate the facts, and they convicted

Jason on the seeming strength of unreliable expert testimony that Christina ate heroin and objectively false claims that large amounts of heroin could disappear flavorlessly into a bowl of cereal.

The Michigan Court of Appeals failed to correct this extreme malfunction of the state system. *Harrington*, 562 U.S. at 102-103. The state court agreed defense counsel's failure to investigate and consult an expert was constitutionally deficient and "objectively unreasonable." *Harris*, 2024 WL 740709 at *6. But the court concluded Jason was not prejudiced, even though "such [expert] evidence **could possibly have affected the jury verdict**" and independent expert "opinions had the **potential to cast doubt upon the prosecution's theory** that Christina died after orally ingesting heroin that was concealed in her cereal." *Id.* at *6-7 (bold added).

The court's prejudice analysis was an unreasonable application of *Strickland* and its progeny. The court made several errors. First, it unreasonably applied *Strickland* when, rather than consider the effect of an independent toxicologist's testimony on the remainder of the prosecution's evidence, the court assumed jurors would disregard a defense expert and uncritically accept the prosecution's circumstantial

case using testimony by Christina's family and Jason's coworkers. *Strickland v. Washington*, 466 U.S. 668, 695-696 (1984).

Second, the court unreasonably applied *Strickland*'s "reasonable probability" standard when it repeatedly acknowledged the "potential" and "possible" effect of expert testimony on the jury verdict but relied on "overwhelming evidence" and "motive" to conclude Jason was not prejudiced. *Strickland*, 466 U.S. at 694; *Hewitt-El v. Burgess*, 53 F.4th 969, 982 (2022) (state court's "notably low bar for what counts as a 'strong case' . . . likely would amount to an unreasonable application of *Strickland*"). The possibility an independent toxicologist would alter the jury's verdict undermines confidence in the outcome of Jason's trial, and the prosecution's reliance on gossip and rumor to establish a motive for Christina's death does not constitute overwhelming evidence.

## A.   The *Strickland* Standard

The Sixth Amendment guarantees a person the right to an attorney in a criminal trial, and the Fourteenth Amendment incorporates that right in state court prosecutions. U.S. Const. amend. VI, XIV. "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

To prevail on a claim "that counsel's assistance was so defective as to require reversal," a person must show (1) that their attorney's performance was deficient and (2) that their attorney's errors made the result of the trial unreliable. *Strickland*, 466 U.S. at 687.

The state court found Jason's trial attorney was deficient. But to refresh, deficient performance means "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. As contemplated by precedent, this was true in Jason's case "where the only reasonable and available defense strategy require[d] consultation with experts or introduction of expert evidence" at trial. *Harrington*, 562 U.S. at 106.

Trial counsel's strategy was to argue Christina died of an accidental overdose after recreationally using heroin. Clark Affidavit at ¶ 6. To that end, counsel needed to rebut the expert opinions presented by Dr. Judge and Dr. Hunter that Christina was not a recreational user of heroin and that she had ingested the drug in a way that was inconsistent with recreational use. "[E]ffectively rebutting that case required a competent expert on the defense side." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014).

Effective defense counsel would have developed that strategy by consulting a toxicologist to prepare for and challenge the prosecution's

theory that Christina unknowingly ate heroin. *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (doing "next to nothing to determine if the State's [scientific] conclusion was impervious to attack" was constitutionally deficient when that science was "fundamental to the State's case.").

In fact, Jason's original retained attorney specifically cited the need to consult experts as a reason he was moving to withdraw:

> There is definitely going to need to be experts, you know, appointed in this case to refute some of the evidence from the prosecutor . . . .

3/10/2021 Pretrial Tr. at 5-6.

Yet Jason's appointed attorney, the lawyer who took the case to trial, utterly failed to investigate and thus failed to present the needed expert testimony. The state courts rightly found him deficient.

From there, the question is prejudice. Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In applying *Strickland* prejudice, the state court reached a decision with which no fairminded jurist could agree. *Harrington*, 562 U.S. at 101.

A primer on *Strickland* prejudice, which is defined as much by what it is not as by what it is. A person "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Prejudice does not mean "outcome-determinative" error. *Id.* Nor must a person show "by a preponderance of the evidence" that the outcome was altered. *Id.* at 694. With *Strickland* "the pertinent question with respect to a determination of prejudice is not one of sufficiency." *Poulsen v. United States*, 717 Fed. App'x 509, 516 (6th Cir. 2017). "[A]lthough we suppose it is a possible that a jury could have heard it all and still have decided [as it did], that is not the test." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005).

All *Strickland* prejudice requires is a reasonable probability. That means a probability "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Applying *Strickland* calls on the appellate court to consider the "totality of the evidence" presented at trial and evaluate "how each piece of evidence was affected by counsel's error." *Id.* at 695. As is the case here, "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . ." *Id.* at 695-696.

**B.**   **The state court agreed testimony by an independent toxicologist could affect the jury's verdict.**

Christina died of a drug overdose, and Dr. Hunter, the medical examiner, ruled her death an accident. TT6 at 26-29. He found no marks suggesting Christina injected heroin. TT6 at 24. This left insufflation (snorting) or oral ingestion (eating) to explain how Christina ingested heroin. TT7 at 20-30.

Insufflation was a problem for the prosecution because it was consistent with recreational use. Christina died in her bed, undressed and tucked under a blanket. To prove first-degree premeditated murder where Christina insufflated heroin, the prosecution would need to convince a jury that Jason forced Christina to snort heroin against her will and then—without seeking medical attention, police assistance, or even contacting her family—Christina went to bed. To prove premeditated murder, the prosecution needed Christina to be unaware she had ingested heroin. With insufflation that was impossible.

Understandably, then, the prosecution made oral ingestion the center of its case. Relying on Jason's statement that Christian had eaten a bowl of cereal before she fell asleep, PX 31, the prosecution marshaled evidence in support of a theory that Jason gave Christina a bowl of cereal

poisoned with heroin. TT7 at 51, 72. Through Dr. Judge, the prosecution presented expert testimony that heroin mixed in cereal milk could be tasteless, that recreational heroin users typically don't eat heroin, and that oral ingestion was consistent with the facts of Christina's death. TT7 at 21, 24-25, 29-31.

But an independent toxicologist could have testified for the defense that the prosecution's oral-ingestion theory was demonstrably false—an opinion toxicologist Dr. William Sawyer offered on direct appeal.

The toxicology report actually showed a high concentration of a metabolite of heroin, 6-MAM, in Christina's urine that would not occur after oral ingestion of heroin. Sawyer Affidavit II at ¶¶ 16-31. The amount of heroin (plus cutting substances) that Christina would need to eat in order to achieve the level of morphine in her blood was too high to disappear flavorlessly into a bowl of cereal. *Id.* at ¶¶ 33-35.

The presence of 6-MAM in Christina's urine was proof she had not eaten heroin. Sawyer Affidavit II at ¶ 31. As Dr. Sawyer explains, "When heroin first enters the stomach . . . the stomach's gastric acids immediately begin converting the heroin into 6-MAM and morphine via deacetylation. This process takes less than 3 minutes." *Id.* at ¶ 18(c). But

it takes at minimum 30 minutes for stomach contents to enter the digestive system and be absorbed. *Id.* at ¶¶ 17, 18(d). The result is that "the heroin and 6-MAM are rapidly converted to morphine with inadequate time to enter circulation to the blood and to the kidneys for excretion." *Id.* at ¶ 23.

In other words, because of its short half-life, 6-MAM is converted to morphine in the stomach before it can be absorbed and excreted into urine. Sawyer Affidavit II at ¶ 23. "[O]nly morphine is significantly absorbed following oral ingestion from the stomach." *Id.* But the laboratory found evidence of 340 ng/ml of 6-MAM in Christina's urine: "nearly 1,000 times higher than in the peripheral levels following heroin oral ingestion which were at or below the 0.33 ng/ml detection limit" in one oral-ingestion study. *Id.* at ¶ 28.

Thus, "the finding of 340 ng/mL of 6-MAM in the urine of Christina Harris presents clear evidence of systemic dosing of heroin via *insufflation* (e.g., sniffing, snorting) *or by injection*, not by ingestion." Sawyer Affidavit II at ¶ 14. And, because the autopsy uncovered no injection sites and Dr. Hunter's testimony established that Christina had

experience with insufflation, TT6 at 24, 44, "*insufflation* remains as the only logical dosing pathway in this matter." *Id.*

Further, consulting an expert would have helped trial counsel rebut Dr. Judge's claim that heroin could disappear flavorlessly into a bowl of cereal. As Dr. Sawyer explains, the large quantity of heroin plus cutting agent that Christina would have to eat in order to achieve 100 ng/ml of morphine in her blood "makes it highly unlikely that its addition could be successfully concealed." Sawyer Affidavit II at ¶¶ 34-35. "It is well known and generally recognized that heroin has a bitter and immediately recognizable taste, not withstanding the taste of cutting substances such as paracetamol, aspirin, and other diluent agents." *Id.* at ¶ 34.

This was strong evidence in favor of Jason's innocence. The prosecution's claim that Christina had eaten heroin was provably false, and its theory that she would not have noticed heroin in her cereal was highly implausible. An expert could have attacked the prosecution's oral-ingestion theory by explaining that the presence of 6-MAM in Christina's urine definitively proved that she had *not* eaten heroin. Sawyer Affidavit II at ¶¶ 13-31. An expert could have supported the defense's theory that insufflation was the most likely method of ingestion in this case. *Id.* at

¶ 14. And an expert could have helped the jury understand just how much heroin Christina ingested based on the level of morphine found in her blood and understand why it was unlikely that such a large amount disappeared flavorlessly in cereal. *Id.* at ¶¶ 32-35.

The Michigan Court of Appeals took no issue with Dr. Sawyer's expertise or opinions. *Harris*, 2024 WL 740709 at *5-6. The court concluded Dr. Sawyer's opinions would have been admissible at trial and any disagreements about the science should be resolved by the jury. *Id.* The court acknowledged Dr. Sawyer "contradicted the prosecution's theory that Christina died as a result of Harris putting heroin in her cereal." *Id.* at *6.

From there, the state court veered off course and tried to split hairs about how much doubt a reasonable probability requires. First it conceded Dr. Sawyer's testimony "**could possibly have affected the jury verdict**." *Id.* (bold added). But the state court went no further because it believed the evidence against Jason was overwhelming, an unreasonable application of *Strickland*.

Then the court split more hairs. It admitted, "**Dr. Sawyer's opinions had the potential to cast doubt upon the prosecution's**

**theory"** that Christina died after eating heroin. *Id.* at \*7 (bold added). But, once more, the court said Jason couldn't overcome the record.

The state court essentially conducted a sufficiency test, where it rejected "the potential to cast doubt upon the prosecution's theory" as prejudice because it did not believe Jason had conclusively refuted the prosecution's case. But that is not the *Strickland* standard. *Rompilla*, 545 U.S. at 393 ("[A]lthough we suppose it is a possible that a jury could have heard it all and still have decided [as it did], that is not the test."); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003) (The "available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal . . . .' ").

> 1. **The state court unreasonably applied *Strickland* when it failed to take "due account of the effect" of counsel's failure to investigate on the prosecution's remaining evidence.**

Having concluded defense counsel's failure to investigate and present expert testimony like Dr. Sawyer's was deficient and that the opinions were admissible at trial, the court needed to "tak[e] due account of the effect of the errors on the remaining findings" before determining whether "the decision reached [by the jury] would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696. But the

court refused to, and no fairminded jurist could agree with the court's view of the strength of the prosecution's otherwise circumstantial case.

The prosecution's witnesses can be divided into two categories. Category one was experts, Dr. Judge and Dr. Hunter, whose testimony that Christina's death was inconsistent with recreational heroin use was directly contradicted by Dr. Sawyer. Category two was lay witnesses, like Jason's former coworkers and Christina's family, who offered circumstantial gossip and rumor that the prosecution used to theorize that Jason wanted to kill Christina and that Christina did not use recreational drugs. Because only Christina and Jason were home the night she died, none of the prosecution's witnesses had first-hand knowledge of what happened.

Under *Strickland*, the Michigan Court of Appeals needed to consider the effect of admitting Dr. Sawyer's opinions on a jury's evaluation of the credibility of the lay witnesses in category two. If jurors believed Dr. Sawyer's opinion that the lack of 6-MAM in Christina's urine meant she had not eaten heroin and the quantity of drugs she had to consume would flavor her cereal, jurors would readily discount the credibility and significance of the category two circumstantial testimony.

Instead the state court did the opposite analysis. It began with the premise that jurors would find all of the prosecution's circumstantial evidence credible. From there, it used the testimony of those lay witnesses to reject the defense's expert opinion and favor the prosecution's expert. *Harris*, 2024 WL 740709 at *6-7.

First, the state court's conclusions here were not factual determinations to which this Court owes deference under 28 U.S.C. § 2254(e)(1). "[W]eighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus it is a mixed question of law and fact not within the Section 2254(e)(1) presumption." *Ramonez v. Berghuis*, 490 F.3d 482, 491 (6th Cir. 2007). Such mixed questions fall squarely within (d)(1) review.

More to the point, the state court's approach directly conflicted with *Strickland*'s clear directive. The Court of Appeals needed to evaluate the *effect* of Dr. Sawyer's opinion on *all* of the prosecution's case, not draw all inferences in favor of the prosecution and then use the prosecution's lay witnesses to discredit the defense's expert. Sitting as a three-person jury and weighing witness credibility on the papers unreasonably applied

*Strickland. Ramonez*, 490 F.3d at 490. The Court of Appeals' holdings about the relative credibility of the prosecution's witnesses compared to Dr. Sawyer were a finding "that a jury would not believe [Dr. Sawyer's] testimony"—not the type of "credibility determinations within the judge's province" that take place at an evidentiary hearing where the judge acts as fact-finder. *Id.*

Turn to the state court's conclusion that no juror would disregard "overwhelming evidence" that Jason "developed a method by which to carry out his [poisoning] plan, had the knowledge of how to acquire illicit substances and had in fact acquired controlled substances to give to Christina on multiple occasions." *Harris*, 2024 WL 740709 at *7.

The evidence of a poisoning plan was not overwhelming; it rested on rumor and speculation by Jason's former coworkers. And the state court never acknowledged that the poisoned-cereal theory was contradicted by objective evidence: Dr. Hunter's autopsy uncovered nothing in Christina's stomach or intestines to show that she had recently eaten anything at all—not to mention a bowl of cereal mixed with large amounts of heroin. TT6 at 47-48, 63; PX 73 at 6.

On the rumor side, the state court accepted as undisputed that Jason "told a co-worker that he wished Christina were dead." *Harris*, 2024 WL 740709 at \*7. **But none of Jason's coworkers independently recalled Jason saying that**. Alan Sharp testified Jason made no statements about wishing his wife was dead, and only after being impeached admitted he "might have" told police that but he couldn't remember it anymore. TT3 at 79-80. John Jamison agreed, after being impeached, that he told police something similar—but he told the jury he actually was repeating something he heard from another coworker, not Jason, and he didn't remember speaking to police. TT3 at 96-98, 106-107.

Similarly, testimony the court cast as proof Jason wanted and tried to kill his wife by poisoning her were really stories about him saying he wanted her to calm down and stop criticizing him. Only one person, David Groshong, said he sold Jason pills. TT3 at 8-9. Groshong said Jason asked for *Xanax*, and Groshong gave him Klonopin. TT3 at 8-9, 23. According to Groshong, Jason said he wanted Xanax so Christina would "stop nagging." TT3 at 17. At work, Groshong testified, "everyone complains about their wives as nagging and this and that . . . ." TT3 at 26. Groshong

didn't "know personally" what the pills were for. TT3 at 10. In a later conversation that Groshong took as "a joking matter, you know, like it was just a joke," Groshong believed Jason commented that he put the Klonopin in water and Christina tasted it. TT3 at 10, 13-14. Zachariah Shustock, another coworker, claimed Jason said he put a pill in Christina's red pop and "[s]he tasted it and didn't like it." TT4 at 8. Shustock recalled Jason said he wanted to find a drug that would "put [Christina] to sleep," not kill her. TT4 at 14. Both Shustock and Groshong testified that they took these conversations as normal venting at work about a spouse. TT3 at 26; TT4 at 15.

Dr. Sawyer's expert opinions undermine the relevance and credibility of the prosecution's rumor and gossip. Most obviously, if jurors believed Christina was not poisoned, then this workplace gossip was probative of Jason's juvenile taste in humor, not premeditation. It was Dr. Sawyer's opinion that, to achieve 100 ng/ml of morphine in her blood, Christina would have to eat a large quantity of bitter heroin. Sawyer Affidavit II at ¶¶ 34-35.

So even if jurors put some stock in the rumors, Dr. Sawyer's testimony still cut against the prosecution's case: the fact that Christina

noticed the flavor or texture of a single Klonopin pill in a glass of red pop cast doubt on the prosecution's theory that she wouldn't notice at least 32mg of heroin plus cutting agents like aspirin or paracetamol mixed into a bowl of cereal. *Id.* at ¶¶ 33-35. But jurors at Jason's trial heard only Dr. Judge's opinion that heroin could disappear flavorlessly into a bowl of cereal so that Christina would be "unlikely to detect it." TT7 at 24.

The prosecution's case needed adversarial testing that could only come from a defense expert. If jurors heard Dr. Sawyer's scientific proof that Christina did not eat heroin, then her death had no connection to the rumors and gossip at Jason's workplace. The effect of Dr. Sawyer's opinion was to make testimony in support of the prosecution's poison theory irrelevant.

The state court unreasonably applied *Strickland* when it failed to consider that admitting evidence disproving Dr. Hunter and Dr. Judge's oral-ingestion opinions necessarily weakened the remainder of the prosecution's circumstantial evidence in support of oral ingestion.

Next consider the state court's certainty that, regardless of Dr. Sawyer's opinion, every juror would always find Jason "solicited a

coworker to murder Christina in exchange for $10,000" and "had previously solicited others to kill her." *Harris*, 2024 WL 740709 at *7.

These conclusions are based entirely on the dubious testimony of Zachariah Shustock, Jason's former coworker. The prosecution (and then the state court) based the claim that Jason "solicited a coworker to murder Christina" on Shustock's recounting of a conversation where both he and Jason complained about their wives. TT4 at 15. Shustock said Jason asked if he would kill Christina for $10,000 from a life insurance policy. TT4 at 9-10.

Shustock didn't take the comment seriously. He "thought [Jason] was just joking." TT4 at 10. Shustock called the conversation "venting" that he could "understand" in the context of Jason's relationship. TT4 at 10. Shustock repeated those two points: he was not "surprised" by Jason's question and "just thought he was joking, kind of venting at work." TT4 at 14. Shustock's answer was equally flip: "it wouldn't be worth it, $10,000. No, I'll pass." TT4 at 17.

Jurors needed to decide whether they agreed with Shustock's take, i.e., Jason was joking, or whether Jason was seriously soliciting his coworker to murder his wife. MCL 750.157(b)(2). Dr. Sawyer's testimony

added significant weight to Shustock's belief that Jason was joking. Give the jurors Dr. Sawyer's opinion and, more likely, Jason was venting the frustrations you'd expect of a father dealing with a growing family and a depleting bank account.

The state court unreasonably applied *Strickland* in treating Shustock's lay testimony as unimpeachable evidence that every juror would have used to discredit Dr. Sawyer. How to interpret Shustock's testimony was a question for the jury that could easily have gone in Jason's favor. *See Ramonez*, 490 F.3d at 491.

The basis for the state court's conclusion that jurors would not doubt "overwhelming evidence" that Jason solicited people other than Shustock to kill Christina is even flimsier. *Harris*, 2024 WL 740709 at *7. That claim also came from Shustock, who said Jason told him he hired someone to kill his wife, "or not to kill her, but to try or look at his house and the person got caught." TT4 at 9. Jason supposedly told Shustock the hired person was a felon carrying a gun who was "seen by a neighbor and arrested." TT4 at 13. The police investigated and found zero evidence in any court records or police agency corroborating this tale of a person who was arrested and caught with a gun near the Harrises' home. TT6 at 105.

Again, Dr. Sawyer's opinion undermining the prosecution's main theory tended to make the prosecution's interpretation of Shustock's testimony less credible, not the other way around.

The state court adopted an even narrower interpretation of what it called "substantial evidence that Christina did not recreationally use drugs." *Harris*, 2024 WL 740709 at *7. The court entirely ignored the fact that a period of abstinence or first-time-use explained Christina's negative drug results—particularly since those drug tests had taken place during pregnancy (months prior to her death). Dr. Sawyer's testimony also cast doubt on the prosecution's breast-milk tests for heroin, considering that only 3 of over 50 bags were tested and that Christina had stockpiled enough frozen breast milk to 'pump and dump' potentially tainted milk.

The rest of the state court's reasons for finding that Dr. Sawyer's opinions could not alter the outcome of the trial amount to the court's conclusion that Jason "had a motive to kill Christina." *Harris*, 2024 WL 740709 at *7 On the facts, the state court too readily relied on rumors of an affair as motive for murder. The state court ignored affectionate text messages between the pair, before *and after* Christina's purported

conversation with Jauss, and evidence the couple saw each other as mutual partners.

On the law, "[m]otive and opportunity, while relevant, are not elements of any crime." *People v. Fisher*, 193 Mich. App. 284, 289; 483 N.W.2d 452 (Mich. Ct. App. 1992). When a prosecutor presents "ample evidence of defendant's motive and opportunity to kill his wife" but offers "no evidence of an act that resulted in [the wife's] death" and only circumstantial evidence that does "not rise above the level of conjecture," the prosecution has failed to prove murder. *Id.* at 287, 289.

The thin evidence of motive presented at trial cannot paper over the holes in the prosecution's case. The prosecution made manner of ingestion central to its case at trial. TT7 at 51. How else could Christina have failed to notice that she was ingesting heroin? The defense's failure to present testimony like Dr. Sawyer's opposing the prosecution's oral-ingestion theory infected every aspect of the case presented to jurors.

The jury needed to hear Dr. Sawyer say that Christina had not died from eating heroin. That conclusion would have supported the autopsy, which turned up no evidence of a recent meal in Christina's stomach or intestines. Properly considering the impact of Dr. Sawyer's opinions on

*all* of the prosecution's evidence, it is reasonably probable "that at least one juror would have struck a different balance" and the result of the trial would have been different. *Wiggins*, 539 U.S. at 537; *see Ramonez*, 490 F.3d at 491.

> **2.    The    state    court    unreasonably    applied *Strickland*'s    definition    of    a    "reasonable probability" when it concluded evidence could affect the jury's verdict but not undermine confidence in the outcome.**

In addition to the state court's failure to follow *Strickland*'s clearly established directive to consider the effect of counsel's errors on all of the evidence presented, the court also failed to properly apply the "reasonable probability" standard for prejudice.

To be sure, the court began by correctly identifying the *Strickland* prejudice test: "a reasonable probability that the result of the trial would have been different," meaning "a probability sufficient to undermine confidence in the outcome." *Harris*, 2024 WL 740709 at *6, quoting *People v. Leffew*, 508 Mich. 625, 637; 975 N.W.2d 896 (Mich. 2022).

But then the court reached the puzzling conclusion that testimony that "could possibly have affected the jury verdict" and "had potential to

cast doubt upon the prosecution's theory" did not undermine confidence in the outcome of Jason's trial. *Harris* 2024 WL 740709 at *6-7.

No fair-minded jurist could find that. Because the prosecution centered its entire case around its oral-ingestion theory, casting doubt on oral ingestion casts doubt on the jury's verdict as a whole. "Confronted with evidence debunking the State's scientific conclusions, the [factfinder] might have had a reasonable doubt," especially considering the biases, contradictions, and lack of memory that plagued the prosecution's remaining lay witnesses. *Richey*, 498 F.3d at 364.

Jason's case and the state court's analysis bear a striking resemblance to *Dendel v. Washington*, 647 Fed. Appx. 612, 616 (6th Cir. 2016). Katherine Dendel's husband Paul, who was chronically ill with a host of ailments, died and the medical examiner found the cause was natural. *Id.* at 613-614. But Paul's family disagreed and went to the police with claims that Dendel was overwhelmed and said she thought about injecting Paul with her insulin. *Id.* at 614. The medical examiner reconsidered and decided Paul died from an insulin overdose. *Id.*

Dendel's defense attorney argued that Paul self-administered the insulin or died from a combination of his own medications. *Id.* On appeal

from the jury's second-degree murder verdict, Dendel argued counsel was ineffective for failing to present testimony by an expert who challenged the medical examiner's conclusion that Paul died of an insulin overdose and who opined Paul's death was caused by his own prescribed medications. *Id.* The Michigan Supreme Court rejected Dendel's claim, finding no reasonable probability of a different outcome because, even if the defense expert testified, "strong circumstantial evidence supported the theory" that Dendel injected Paul with insulin, citing Dendel's alleged statements, demeanor, frustration with being a caretaker, "attempt to cover up the crime" by calling a friend instead of 911, and effort to avoid an autopsy by demanding Paul's body be cremated. *People v. Dendel*, 481 Mich. 114, 132-134; 748 N.W.2d 859 (2008).

Under AEDPA review, the Sixth Circuit rejected this prejudice analysis because it inflated the reasonable probability requirement. *Dendel*, 647 Fed. App'x at 615-616. The Court explained, "evidence rebutting the prosecution's insulin-injunction theory of causation would have at least undermined confidence in the medical evidence used to convict [Dendel], which is the test for reasonable probability." *Id.* at 616. "At minimum," the Court determined, presenting expert evidence in

support of the defense's trial theory that Paul died from his own medications would have "raised doubt about Dendel's guilt and undermined confidence in her conviction or sentence." *Id.*

The same is true for Jason, whose attorney argued without expert support that Christina died after recreationally insufflating heroin. TT7 at 80-81, 98. "At minimum," presenting expert testimony in support of that claim rebuts the prosecution's theory of causation, raises doubts about Jason's guilt, and undermines confidence in his conviction. The Michigan Court of Appeals itself admitted that much was true. *Harris*, 2024 WL 740709 at *6-7. The state court's refusal to acknowledge that undermining confidence in the jury's verdict satisfies *Strickland*'s prejudice standard is an unreasonable application of Supreme Court precedent under § 2254(d)(1).

### C.   Jason is entitled to relief under de novo review.

When a state court unreasonably applies established federal law, this Court is free to engage in de novo review of the claim under controlling law. *Rice v. White*, 660 F.3d 242, 252, 257 (6th Cir. 2011).

Correctly applying the *Strickland* standard, Jason was prejudiced by his attorney's failure to investigate and present testimony like Dr.

Sawyer's. Jason's defense at trial was that Christina voluntarily used heroin and died of a recreational drug overdose. TT7 at 80-81. As counsel argued to the jury, "[t]he prosecution has to have you believe that Jason Harris put it in her food," because it was unlikely he could have injected Christina with a needle against her will and even more unlikely that she would have involuntarily snorted a drug. TT7 at 98. According to the defense, "[t]he most logical way she ingested that much heroin was that she did it nasally." TT7 at 98.

A toxicologist like Dr. Sawyer could have provided the objective evidentiary support Jason needed for this defense. Without it, counsel had only his unproductive cross-examination of the prosecution's experts. In the face of Dr. Judge's opinion that someone would be "unlikely to detect" heroin in milk because its bitter flavor would be diluted, counsel's only rebuttal was to elicit on cross-examination the relatively benign statement that the flavor "would depend on how much was diluted in the water and the purity of the heroin." TT7 at 24, 43-44. Although Dr. Hunter admitted he never checked Christina's nose for drug residue, Dr. Judge insisted on cross-examination that this information did not change his opinion that Christina hadn't snorted heroin, because there

was no "powder or residue or rolled up paper or dollar bills at the scene"—an observation based, not on science, but a lay opinion of a scene the police had only "glance[d]" at. TT2 at 130; TT6 at 58-59; TT7 at 40-41.

The absence of a defense expert prejudiced Jason on all counts. On Counts 1 and 3, first-degree murder and delivery of a controlled substance causing death, the absence of an independent expert left unopposed the prosecution's claim that Christina was poisoned with heroin in her cereal. The defense produced no evidence to contradict the prosecution's expert opinions and convince a jury to reject the conclusion that Christina had eaten heroin. Counsel's error permitted the prosecution to use rumor and speculation to transform an accidental overdose into a premeditated poisoning, and made conviction on Counts 1 and 3 more likely.

Counsel's errors also prejudiced Jason on Count 2, solicitation to commit homicide. The conclusion that Jason solicited a coworker to kill his wife was largely driven by the jury's conclusion that Jason later committed murder. Any direct evidence underlying this charge was weak. Zachariah Shustock said Jason offered him money to kill Christina but immediately qualified that testimony by saying "I thought he was

just joking." TT4 at 10. Calling an expert to testify that Christina's death was consistent with the recreational use of heroin would have upended any claim that Jason solicited another person to commit murder.

Counsel's failure to even investigate calling an expert resulted in Jason's conviction on all counts. Jason is entitled to a new trial.

## II. The state court erred under (d)(1) and (d)(2) in rejecting Jason's claim that his attorney was ineffective for failing to object to Dr. Hunter's trial testimony vouching for the credibility of the prosecution's witnesses, the prosecution's case, and invading the province of the jury.

Dr. Hunter testified, for the state, as an expert "in the area of forensic pathology." TT6 at 14. He conducted an autopsy of Christina in 2014 and reached conclusions about the cause and manner of her death. TT6 at 18-20, 32. Dr. Hunter determined that Christina's death was caused by "heroin toxicity" and, in 2014, found the manner of her death was an "accident." TT6 at 32.

In 2019, Dr. Hunter changed his mind. But not based on any new science. Instead, Dr. Hunter reviewed witness statements and other information gathered during a civil suit. From there, he ruled Christina's manner of death a homicide. TT6 at 46. His finding that her death had been caused by heroin toxicity remained the same. TT6 at 46.

The change to Dr. Hunter's manner-of-death ruling from accident to homicide wasn't based on reliable data and methods. Just the opposite: he relied on his own evaluation of witness credibility, his idiosyncratic beliefs about the behavior of heroin users, and his assumption that only

chronic heroin users die of accidental heroin overdoses. Worse, Dr. Hunter relayed all the above to Jason's jury.

Dr. Hunter went far beyond the bounds of what experts could say under MRE 702 and invaded the province of the jury. He told jurors the prosecution "actually proved the negative, [Christina] did not use drugs knowingly of her own accord." TT6 at 43. He said he "felt very comfortable" believing testimony by coworkers like David Groshong and that "those statements were valid." TT6 at 46. And, crediting Zachariah Shustock's testimony, Dr. Hunter told jurors "with lots of conversations with multiple people [about] hiring hitmen to end her life, I can't say that he [Jason] did it and one of those other people [hitmen] didn't do it, but I can say she did not do this to herself." TT6 at 46.

No specialized training or qualification allowed Dr. Hunter to vouch for the credibility of witness statements. Indeed, there is no training that qualifies an expert in determining "what actually is the truth." *People v. Beckley*, 434 Mich. 691, 728; 456 N.W.2d 391 (1990); see also *People v. Smith*, 425 Mich. 98, 109; 387 N.W.2d 814 (1986) ("In the absence of any evidence qualifying him as an expert in assessing credibility, his opinion lacked a reliable foundation.").

The jury should never have heard Dr. Hunter's improper opinions. On appeal, Jason challenged his attorney's failure to object to Dr. Hunter's testimony as irrelevant under MRE 702 and invading the province of the jury by vouching for the prosecutor's case.

The Michigan Court of Appeals denied Jason's *Strickland* claim. According to the state court, counsel's failure to object was not deficient because Dr. Hunter's testimony was admissible. *Harris*, 2024 WL 740709 at *8-12. In reaching that conclusion the court acknowledged "Dr. Hunter commented on the perceived credibility of information received from other persons," but excused it because his testimony was not "offered" or "used" to suggest Dr. Hunter had "specialized expertise for determining . . . credibility." *Id.* at *12. These conclusions were unreasonable applications of *Strickland* and its progeny under § 2254(d)(1).

Moreover, the court premised its decision on the conclusion that Dr. Hunter "did not . . . testify that Harris was guilty or that he had a culpable state of mind." *Id.* at *9. That holding ignored large portions of Dr. Hunter's testimony and his written report, an unreasonable determination of the facts in light of the evidence presented at Jason's trial, entitling him to *de novo* review under § 2254(d)(2).

### A.    Dr. Hunter's testimony was inadmissible under clearly established law interpreting MRE 702.

Michigan is a *Daubert* state where all expert testimony must satisfy MRE 702. Per 702, a trial court "may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v. DaimlerChrysler Corp*, 470 Mich. 749, 782; 685 N.W.2d 391 (2004). The court's gatekeeping responsibility to evaluate all expert evidence is "mandated by MRE 702 irrespective of whether the proffered evidence is 'novel' " or long-recognized. *Id.* at 782 n.52.

Admissibility turns on two questions: is the proposed expert opinion reliable, and is it relevant? *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 709 (1993); *People v. Kowalski*, 492 Mich. 106, 120; 821 N.W.2d 14 (2012). The trial court must conduct "a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert*, 470 Mich. at 782.

A reliable opinion is "ground[ed] in the methods and procedures of science"; it is founded on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The opinion must "be based on sufficient facts or data," be "the product of reliable principles and

methods," *and* the expert must have "reliably applied the principles and methods to the facts of the case." MRE 702.

An opinion is relevant if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." MRE 702. But "if the average juror does not need the aid of expert interpretation to understand a fact at issue, then the proffered testimony is not admissible because 'it merely deals with a proposition that is not beyond the ken of common knowledge.' " *Kowalski*, 492 Mich. at 122, quoting *Gilbert*, 470 Mich. at 790. Reliability and relevance are distinct but interrelated. Both must be satisfied for the expert opinion to be admitted. *Id.*, 492 Mich. at 122. Qualified reliable expert testimony "may be properly excluded if it is not relevant to the facts of the case or is offered for a proposition that does not require the aid of expert interpretation." *Id.*

Expert testimony about credibility is never relevant, and no expert is permitted to "comment or provide an opinion on the credibility of another person while testifying at trial." *People v Musser*, 494 Mich. 337, 349; 835 N.W.2d 319 (2013). Credibility determinations are the province of the jury, alone. Testimony about credibility "has no probative value";

the expert's opinion is irrelevant because the jury is "in just as good a position to evaluate the witness's testimony." *Id.* (quoting *Smith*, 425 Mich. at 109).

Dr. Hunter's testimony crossed all of those boundaries.

### 1. Dr. Hunter told jurors the testimony of the prosecution's lay witnesses was credible.

Start with exactly what Dr. Hunter said about his 2019 opinion switch (from accident to homicide). In his amended autopsy report, admitted at trial, he made clear he changed the manner of death "due to additional information being provided to my office in the spring/summer of 2019." PX 73 at 2.

The "additional information" did not include a second autopsy or an exciting breakthrough in the pathology applied to Christina's case. The new information was "20 deposition transcripts, police reports, police summaries, medical records for the decedent as well as her kids, and the decedent's employment record." PX 73 at 2.

From that raft of new papers, alone, Dr. Hunter decided Christina had not died of an accidental overdose. What moved Dr. Hunter were the "statements/testimony of neighbors, co-workers, and her spouse, as well" as circumstantial factors like "her high levels of job performance, her

personal medical records, the medical records of the infant that she was breast feeding for the 4 months leading up to her death and samples of breast milk from the 4 months leading to her death which tested negative for drugs." PX 73 at 2.

Focus on the deposition testimony Dr. Hunter read. He relied on "a third party's plan/desire to end Ms. Harris's life, as well as, attempts being made on her life prior to the final events," including "poisoning her beverage with a controlled substance which is consistent with the proposed final mechanism used to end her life (i.e. mixing Heroin with food)." PX 73 at 3. In context, "third party" clearly meant Jason. Here, Dr. Hunter bought the prosecutor's theory that Jason laced Christina's cereal with heroin.

To any lay juror reading Dr. Hunter's report, one conclusion was inescapable. He believed the gossip and rumors from the Harrises' coworkers, families, and neighbors. Those statements convinced Dr. Hunter that Jason had a "plan/desire" to end Christina's life and that he had tried more than once to poison her.

Dr. Hunter's trial testimony made his point even clearer. He explicitly told jurors he believed the prosecution's witnesses were

truthful and explained why. Dr. Hunter credited Groshong because "I believe [Groshong] had previously been convicted of a crime by selling this man drugs." Groshong "put himself in jeopardy by reporting that to law enforcement as committing another crime." Dr. Hunter reminded the jury: "it's illegal to do that." Then Dr. Hunter fed the jury his inferences about Groshong's motive for saying anything at all about Jason: "there's actually the ulterior motive for him not to say that because he put himself in jeopardy. *So I felt very comfortable those statements were valid.*" TT6, 45-46 (emphasis added).

Based solely on his own review of Groshong's statements, Dr. Hunter told the jury it was "valid" that (1) Jason bought drugs at work and (2) Jason placed those drugs in Christina's beverage in an attempt on her life. Dr. Hunter said so because Groshong had previously been convicted of giving Jason drugs (this was false, but no one corrected him). The jury had no need to evaluate Groshong's credibility; Dr. Hunter did it for them.

Dr. Hunter continued. He told the jury he found credible "statements to [Jason's] own family members regarding his interest in killing his wife." TT6 at 46. And he endorsed as truthful other witnesses'

reports. Here's how Dr. Hunter came to believe Shustock's testimony about Jason's supposed statements: "to one coworker [Jason] said I hired a hitman, it didn't work out. He got arrested before he could do it. So I said to myself okay, this is certainly supportive of someone else being involved in her death." TT6 at 45.

Dr. Hunter's vouching could not have been more explicit. He listed the witnesses he believed, told jurors he believed them, and explained why he believed them: they were statements made under oath, statements against the witness's own personal or family member's interest, or statements corroborated by other witnesses. And some of Dr. Hunter's reasons for crediting the witnesses were false (like the mistaken drug conviction). Testifying as an expert, Dr. Hunter vouched for the truthfulness and credibility of the prosecution's lay witnesses.

### 2. Dr. Hunter told jurors the police investigation was reliable because it was so thorough.

Dr. Hunter was also a cheerleader for the police investigation, which he praised as accurate and thorough. He told jurors he had been the medical examiner for Genesee County since 2007 and had testified as an expert witness in hundreds of cases. TT6 at 9, 14. He presented himself as a skeptic who ruled Christina's death an accident until the

police could "prove the negative" that she was not a recreational user. TT6 at 42-43. And he was convinced, because "the amount of information that I received is extraordinary and far more than what I would—it's five years worth of an investigation, and it's more than I ever received on any case in just about—that I can remember." TT6 at 42.

He gave the police, and his wife, credit for enduring a monumental investigation as Dr. Hunter digested "an extraordinary amount of information." TT6 at 70. He completed "[a] month and a half of case review, and my wife was not pleased. She said you're spending more time on this than me." *Id*.

The message was clear: the jury should not disagree in a few hours with the conclusion Dr. Hunter had reached after weeks of evaluating an exhaustive police investigation—the most thorough investigation Dr. Hunter had ever seen.

### 3. Dr. Hunter told jurors Jason was responsible for Christina's death because Jason, or a hitman Jason hired, killed her.

Dr. Hunter did not stop with vouching. He reached the ultimate conclusion in his written report and his trial testimony. In both places he

told the jurors that Jason, or a person Jason hired, intentionally caused Christina's death.

Begin with the report, admitted as Prosecutor's Exhibit 73. Without using Jason's name, Dr. Hunter concluded Christina had been "given this drug intentionally by a third party." PX 37 at 2-3.

Dr. Hunter left no doubt that "third party" meant "Jason Harris." Recall that he ruled her death a homicide based, in part, on deposition testimony about poisoning beverages and previous "attempts" on Christina's life by a "third party" who wanted her dead.

The only deposition testimony about a "third party's plan/desire to end Ms. Harris's life" was about Jason Harris. The only person accused of "poisoning her beverage with a controlled substance" was Jason Harris. The only person the prosecutor claimed had made "attempts . . . on her life" was Jason Harris. To any juror who had sat through the previous four days of prosecution witnesses, there could be no doubt that Dr. Hunter believed Christina was "given this drug intentionally by [Jason Harris]." PX 73 at 2-3.

Dr. Hunter's trial testimony was just as forthright. Having walked the jury through his reasons for rejecting accident and suicide, he

explained his change of heart in a lengthy monologue. TT6 at 45:4-46:16.

Dr. Hunter put stock in "the information that I got during the deposition."

*Id*. at 45. It mattered to Dr. Hunter that "[Jason] had made statements

to [coworkers] or referenced problems with his wife, wanting to get rid of

her, trying to acquire drugs, attempts to place drugs in her food." *Id*. It

mattered to Dr. Hunter that Jason "hired a hitman." *Id*. So Dr. Hunter

"said to myself okay, this is definitely supportive of someone else being

involved in her death. Can I definitively say who, no." *Id*. But then Dr.

Hunter continued:

> Now again with lots of conversations with multiple people
> [about] hiring hitmen to end her life, I can't say that he
> [Jason] did it and one of the other people [hitmen Jason hired]
> didn't do it, but I can say she did not do this to herself.
> Accidentally, unwillingly, someone else did this to her.

*Id*. at 46. Dr. Hunter concluded Jason intentionally murdered his wife.

The prosecutor tried to minimize the inappropriate opinion, asking

"So you're not saying who did it, but you don't believe she did it to

herself?" TT6 at 46. Though Dr. Hunter replied, "Correct," the cat was

out of the bag. *Id*. Anyone listening to Dr. Hunter's testimony knew that

Dr. Hunter believed "[Jason Harris] did this to her." *Id*.

### B.   The state court erred under (d)(2) when it held that Dr. Hunter did not tell jurors Jason was guilty or had a culpable mind.

The state court saw no deficient performance in defense counsel's failure to object to Dr. Hunter's vouching testimony. For reasons explained later, that decision was an unreasonable application of *Strickland*. But here, the focus is on the court's factual determination that Dr. Hunter never reached the ultimate question of fact and invaded the province of the jury, an unreasonable factual determination under Section 2254(d)(2).

On that score, the state court botched the facts and said: "Dr. Hunter opined that Christina did not voluntarily ingest heroin, but also conceded that he did not know who had killed her. He did not, therefore, testify that Harris was guilty or that he had a culpable state of mind." *Harris*, 2024 WL 740709 at *9.

AEDPA's prong two permits relief when the state appeal "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[S]tate court factual findings are presumed correct and federal courts may displace them only when the findings are

shown to be 'objectively unreasonable by clear and convincing evidence.' "
*Hodge v. Plappert*, 136 F.4th 648, 666 (6th Cir. 2025) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)). "A state court's factual findings are objectively unreasonable only if the prisoner's interpretation of the facts is 'the *only* conclusion that can be fairly drawn' from the state court record." *Randolph v. Macauley*, 155 F.4th 859, 869 (6th Cir. 2025) (quoting *Rice v. White*, 660 F.3d 242, 254 (6th Cir. 2011)). To obtain relief, the state court's unreasonable factual determination must be the but-for cause of its decision. *Randolph*, 155 F.4th at 869.

> **1. No fair reading of Dr. Hunter's testimony and 2019 autopsy report supports the conclusion that Dr. Hunter *did not* tell the jury that Jason was responsible for Christina's death and that he acted with intent.**

Notably, the state court included a block quote of Dr. Hunter's testimony in its opinion. But the state court ended the quote immediately after Dr. Hunter concluded "accident wasn't the appropriate manner of death" and immediately before he began his lengthy explanation of why he believed Christina's death was a homicide. *Harris*, 2024 WL 740709 at *10 (quoting TT6 at 42:16-43:13 and 44:3-44:22); see TT6 at 45:4-46:16. Omitting       record       evidence       supporting       Jason's       claim       was

unreasonable. *Brumfield v. Cain*, 576 U.S. 305, 317-320 (2015) (state court's finding that no evidence supported petitioner's claim was an unreasonable factual determination when the record *did* contain evidence supporting it, even though "other evidence in the record . . . may have cut against" petitioner's claim).

The only reasonable interpretation of Dr. Hunter's references to the "third party" responsible for Christina's death was that he meant Jason. Every reason Dr. Hunter gave for ruling Christina's death a homicide in his trial testimony was specific to Jason: "coworkers who had said [Jason] had made statements to them," "[t]o one coworker [Jason] said I hired a hitman," "one of the coworkers who provided the drug that [Jason] placed in her beverage," "statements to [Jason's] own family members regarding his interest in killing his wife." TT6 at 45-46. The same is true of Dr. Hunter's amended forensic autopsy report, which based the homicide ruling on "a third party's plan/desire to end Ms. Harris's life" and specified acts jurors knew Jason was accused of committing, like placing a crushed pill in her beverage. PX 73 at 2-3.

Likewise, no fair reading of the trial evidence supports the conclusion that Dr. Hunter did not tell jurors that Jason acted with "a

culpable state of mind." The autopsy report repeatedly found intent, concluding Christina was "intentionally dosed with heroin," that there was a "plan/desire to end Ms. Harris's life," "attempts being made on her life" which "included poisoning her beverage," all of which Dr. Hunter wrote "tips the scales" toward homicide and away from undetermined. PX 73 at 2-3. Likewise, the evidence Dr. Hunter cited in his testimony explaining the homicide determination went directly to intent and premeditation: "wanting to get rid of her," "interest in killing his wife," "hiring hitmen to end her life." TT6 at 45-46.

Then Dr. Hunter unmistakably reached the ultimate conclusion: "I can't say that [Jason] did it and one of the other people [Jason hired] didn't do it, but I can say she did not do this to herself." *Id.* at 46

Any juror hearing this testimony knew who Dr. Hunter held responsible for Christina's death: Jason, or a hitman Jason hired, killed Christina, and her death was intentional and premeditated.

> **2.    The state court's unreasonable read of Dr. Hunter's evidence caused it to erroneously conclude any objection was frivolous and, thus, counsel was not ineffective.**

This factual error caused the state court to deny Jason's federal Sixth Amendment claim. *Randolph*, 155 F.4th at 869. According to the

state court Dr. Hunter did not invade the province of the jury, establishing the but-for cause of the court's conclusion that an objection would have been frivolous and so counsel was not ineffective. *Harris*, 2024 WL 740709 at *10.

Jason's *Strickland* claim was premised on the argument that Dr. Hunter's testimony was inadmissible under MRE 702. Rather than offer *expert* opinion, Dr. Hunter offered his lay beliefs about witness credibility. No scientific method aided Dr. Hunter's human-lie-detector approach, and the jury was in just as good a position to evaluate the prosecution's lay witnesses. Then, based on his view of witness credibility, Dr. Hunter found Jason guilty of murder, a conclusion that invaded the province of the jury when he shared it at trial. Jason's lawyer should have objected to Dr. Hunter's testimony.

To prevail under *Strickland*, Jason needed to prevail under MRE 702. Jason's claim was grounded in three cases that control expert vouching: *People v. Smith*, 425 Mich. 98; 387 N.W.2d 814 (1986); *People v. Thorpe*, 405 Mich. 230; 934 N.W.2d 693 (2019); and *People v. McFarlane*, 325 Mich. App. 507; 926 N.W.d2d 339 (2018). Under a reasonable determination of the facts, these cases support a meritorious objection to

Dr. Hunter's testimony and make trial counsel's failure to object constitutionally deficient.

Begin with *Smith*, where the Michigan Supreme Court held that MRE 702 excludes a doctor's opinion when it is "based, not on any findings within the realm of his medical capabilities or expertise as [a physician], but, rather, on the emotional state of, and the history given by, the complainant." 425 Mich. at 112-113.

In *Thorpe*, the Supreme Court called *Smith*'s holding "a very straightforward bright-line test that trial courts can readily observe":

> An examining physician's opinion is objectionable when it is based 'on what [a witness] . . . told' the physician. Such testimony is not permissible because 'a jury [is] in just as good a position to evaluate the [witness's] testimony as' the doctor.

*Thorpe*, 504 Mich. at 262 (quoting *Smith*, 425 Mich. at 109).

*Smith* and *Thorpe* go to the relevance prong of MRE 702, announcing a bright-line rule that, regardless of reliability, medical testimony about the credibility of a witness statement is not relevant. That makes sense: testimony evaluating credibility has "no probative value," so it is never relevant. *Musser*, 494 Mich. at 349.

*McFarlane* puts *Smith*'s rule into action. An expert in child-abuse pediatrics testified about the nature of a child's injuries, concluded based

on medical evidence that the injuries were inflicted not accidental, and then went on to opine that the injuries were the result of "abusive head trauma" based on "the totality of the circumstances," including past abuse the child experienced and the expert's experience seeing other people in unrelated cases confess to inflicting similar injuries. *McFarlane*, 325 Mich. App. at 523-524.

*McFarlane* held that the doctor's testimony was admissible to the extent that it was "interpreting the medical evidence and offering the opinion that the trauma was caused by human agency," because that opinion was based on expertise a layperson did not possess. *Id.* at 523. But the doctor's opinion that the injuries were "child abuse" was inadmissible. *Id.* at 524. That opinion was not relevant because it was based on evidence the jury was equally capable of assessing: the significance of past abuse in the child's life and the doctor's observations of other people admitting abuse in other cases. *Id.*

Moreover, the court held, an "abuse" diagnosis erroneously offered an opinion on the defendant's intent or criminal responsibility. *Id.* at 523. When an expert "phrase[s] his opinion in terms of a legal conclusion,"

*McFarlane* warned, "the province of the jury is invaded." *Id.* at 519 (quoting *People v. Drossart*, 99 Mich. App. 66, 75; 297 N.W.2d 863 (1980)).

For Jason, the only basis the state court provided to distinguish Dr. Hunter's testimony from the expert in *McFarlane* was factual: Dr. Hunter "did not . . . testify that Harris was guilty or that he had a culpable state of mind." *Harris*, 2024 WL 740709 at *9. On that factual determination, the state court concluded *Smith*, *Thorpe*, and *McFarlane* did not govern Jason's case.

As explained above, that factual determination was unreasonable. Thus Dr. Hunter's opinion and its explanation were irrelevant under MRE 702 because they fell outside the bright-line test established in *Smith* and reiterated in *Thorpe*. His opinion came from what witnesses told the police, testimony a "jury is in just as good a position to evaluate . . . as the doctor." *Thorpe*, 504 Mich. at 262.

Without relevance Dr. Hunter's opinion testimony was inadmissible, regardless of whether the state court thought his methods were reliable under *People v. Unger* or MCL 52.202. *Daubert*, 509 U.S. at 589; *Kowalski*, 492 Mich. at 120; *Gilbert*, 470 Mich. at 790.

Because the state court's rejection of Jason's *Strickland* claim was premised on the unreasonable factual finding that Dr. Hunter did not testify about Jason's guilt or culpable mental state, he is entitled to de novo review and relief from this Court. *Randolph*, 155 F.4th at 869.

**C.    The state court erred under (d)(1) when it concluded counsel's failure to object was not deficient because, to the extent Dr. Hunter vouched for credibility, he was just describing the basis for his opinion.**

Finally, the Michigan Court of Appeals unreasonably applied *Strickland* in finding no deficient performance where Jason's lawyer never objected to Dr. Hunter's vouching. It bears repeating, an expert *can never* "comment on the . . . truthfulness" of a witness statement, "vouch for the veracity" of a witness, or "give an opinion as to whether [the witness] was telling the truth when he made the statements to the police." *Kowalski*, 492 Mich. at 129 (internal citations omitted). The state court utterly failed to acknowledge, let alone correct, Dr. Hunter's vouching. For that reason, the court rejected Jason's *Strickland* claim.

A recent case from the Western District of Michigan illustrates the problem. *See Penley v. Davids*, No. 20-cv-132, 2023 WL 2259131 (W.D. Mich. Feb. 28, 2023). *Penley* involved an expert witness in a child sexual assault trial. *Id.* The expert took the stand and told jurors she listened to

the complainant's account as part of the police investigation. *Id.* at *6. Four times the expert said she found the complainant's account was a "valid disclosure of sexual assault." *Id.* at *26-27.

The defense didn't object. On direct appeal, the state courts affirmed Penley's conviction. Primarily, the state courts rejected any contention that the expert vouched for the complainant by referring to his accusation as "valid," reasoning that the expert was talking about the process by which the statement was obtained and not the complainant's truthfulness. *Id.* at *26.

The Western District found otherwise: "it would be quite reasonable for a lay juror to interpret [the expert's] testimony as communicating that [the complainant's] allegations were 'valid' because they were truthful or, at least perceived by [the expert] to be truthful." *Id.* at *27.

From there, the Western District granted the writ. The reason is straightforward: an expert vouches for a lay witness's testimony by repeatedly using the term "valid" to describe that lay witness's account. When a state court finds no deficient performance for failing to object, yet fails to acknowledge that jurors would reasonably believe the expert was vouching, the court unreasonably applies *Strickland*.

The logic and holding in *Penley* apply with as much, if not more, force here. Begin with Dr. Hunter's testimony that Groshong made "valid" statements. The "valid" statements all involved Jason wanting to obtain drugs to poison his wife. The expert's use of "valid" to describe a lay witness's account sent the jury a clear signal: the lay witness's "allegations were 'valid' because they were truthful or, at least perceived by [the expert] to be truthful." *Penley*, 2023 WL 2259131 *27.

The Michigan Court of Appeals acknowledged that "Dr. Hunter commented on the perceived credibility of information received from other persons." *Harris*, 2024 WL 740709 at *12. But, like the state court in *Penley*, it excused the credibility testimony, reasoning that Dr. Hunter was just "explaining why it caused him to change his opinion" and not suggesting he "had any specialized expertise for determining . . . credibility." *Id.*

That conclusion was unreasonable. No fairminded jurist could find that lay jurors, after listening to Dr. Hunter, would reach the Court of Appeals' overly legalistic interpretation that the medical examiner was just explaining his process *without* talking about the credibility of other witnesses' testimony.

And Dr. Hunter's vouching went further than *Penley*. Dr. Hunter bolstered the police investigation, calling it thorough and extensive. Dr. Hunter, a trained pathologist, told the jury that the state "proved the negative," extinguishing any doubt that Christina used drugs recreationally. Dr. Hunter credited witness testimony simply because the witness took an oath. Or made the statement to police. Or implicated a family member. In all, Dr. Hunter vouched for the credibility of every prosecution witness who painted Jason as a poisoner. And he vouched for the seven-year delay in bringing Jason to trial, calling the trial the product of the most thorough police investigation he had ever seen.

None of the above required expert training, just the ability to read a police report and draw a conclusion. The jury could do the same, and didn't need an expert's guiding hand to do so. Dr. Hunter vouched for the state's case, and no fairminded jurist could think otherwise. The state court unreasonably applied *Strickland* in finding no deficient performance where counsel failed to object to the vouching.

### D. Jason is entitled to relief under de novo review.

An attorney's performance is deficient if his "representation fell below an objective standard of reasonableness . . . considering all the

circumstances." *Strickland*, 466 U.S. at 688. The reasonableness of "strategic choices made after less than complete investigation" depends on the "extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-691.

Here, counsel's failure to object to Dr. Hunter's testimony was inextricably tied to his failure to investigate Dr. Judge's opinion. Counsel was unable to prepare a reasonable strategy to contest Dr. Hunter's manner-of-death opinion, because he decided on the basis of inadequate investigation that he should focus the jury's attention on the circumstances of Dr. Hunter's changed opinion rather than the scientific validity of the prosecution's case. Clark Affidavit at ¶¶ 5-6. In other words, trial counsel could not evaluate the reasonableness of a strategy of embracing Dr. Hunter's unreliable, irrelevant opinions as evidence of an accidental death. *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("To make a reasoned judgment about whether evidence is worth presenting, one must know what it says.").

Moreover, the strategy the Michigan Court of Appeals attributed to trial counsel was objectively unreasonable. *Harris,* 2024 WL 740709 at *10-11. Centering Jason's defense around an accident opinion that Dr.

Hunter openly disavowed only allowed Dr. Hunter more opportunities to reinforce his changed homicide opinion and its improper foundation. Trial counsel's purported strategy *endorsed* Dr. Hunter as an expert that the jury should rely on—but, as discussed above, Dr. Hunter was offering highly improper and inexpert opinions to the jury.

A strategy of proving that Dr. Hunter was swayed by biased actors was particularly ineffective because of how Dr. Hunter cast himself as a skeptic committed to the truth and the monumental investigation he attributed to himself and the police. TT6 at 42, 70.

This left the defense trying to convince the jury to reject Dr. Hunter's thoroughly-explained homicide opinion in favor of his cast-off accident opinion. The defense should not have been in that position. Dr. Hunter's manner-of-death opinions should never have been admitted.

Given the defense theory of an accidental death, a reasonable attorney would have moved to exclude Dr. Hunter's opinion and Dr. Hunter's report. The information available to counsel before trial supported a straight-forward MRE 702 objection to Dr. Hunter's opinion based on the Rule's requirements and the existing caselaw interpreting it. Counsel's failure to object was unreasonable and not strategic.

The prejudice to the defense was immediate and cannot be understated. In a case that turned on rumor and speculation, Dr. Hunter explicitly endorsed the credibility of the prosecutor's witnesses and announced that the state had "proven the negative" that Christina was not a recreational drug user. The jury heard from a supposedly impartial expert that he examined the same evidence presented to them, found it credible, and concluded Jason was guilty of intentionally murdering his wife. He also examined the evidence and concluded Jason had solicited others for murder. Dr. Hunter's testimony reinforcing the prosecution's interpretation of the evidence and reaching the ultimate factual issues presented at trial undermines confidence in the jury's verdict on all counts. Jason is entitled to relief.

## Relief Requested

The Court should grant Jason Thomas Harris's petition for a writ of habeas corpus. Mr. Harris is entitled to relief as "law and justice require." 28 U.S.C. § 2243; *Schlup v. Delo*, 513 U.S. 298, 319 (1995) (habeas "is, at its core, an equitable remedy"). For the forgoing reasons, Mr. Harris's case warrants an unconditional writ of habeas corpus.

Respectfully submitted,

**State Appellate Defender Office**
/s/ Emma C. Lawton
**Emma C. Lawton (P80816)**
Assistant Defender
*Counsel for Jason Thomas Harris*
State Appellate Defender Office
3031 West Grand Boulevard, Suite 450
Detroit, Michigan 48202
Phone: (313) 256-9833
elawton@sado.org

Date: December 26, 2025